## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DAVID FUQUA,<br><br>      Plaintiff<br><br>-vs.-<br><br>THE CITY OF ALTUS, a political<br>subdivision of the State of Oklahoma,<br>JACK SMILEY,<br>in his individual capacity,<br>DEBBIE DAVIS,<br>in her individual capacity, and<br>JAN NEUFELD,<br>in her individual capacity,<br><br>      Defendants. | )<br>)<br>)<br>)<br>)  Case No. CIV-17-115-HE<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MOTION FOR SUMMARY JUDGMENT OF
## DEFENDANT THE CITY OF ALTUS
## <u>COMBINED WITH BRIEF IN SUPPORT OF MOTION</u>

Margaret McMorrow-Love, OBA #5538
John J. Love, OBA #5536
THE LOVE LAW FIRM
228 Robert S. Kerr Ave., Suite 540
Oklahoma City, Oklahoma 73102
(405) 235-3848
Fax: (405) 235-3863
Email: mml@lovelawfirm.legal
Email: jjl@lovelawfirm.legal
*Attorneys for Defendant The City of Altus*

February 15, 2018

## TABLE OF CONTENTS

MOTION FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BRIEF IN SUPPORT OF MOTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    UNDISPUTED MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   ARGUMENT AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      A.    Basis of Claims Against the City . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      B.    Standard for Granting Summary Judgment . . . . . . . . . . . . . . . . . . . . . . 12

      C.    The Religious Discrimination Claims
            Against the City Should be Dismissed . . . . . . . . . . . . . . . . . . . . . . . . . 13

            1.    Elements of a Claim Under Title VII for Religious
                  Discrimination or Under §1983 for Violation of
                  Religious Freedom or Equal Protection . . . . . . . . . . . . . . . . . . . . 13

                  i.    There is no Direct Evidence of Discrimination . . . . . . . . . . 15

                  ii.   *McDonnell Douglas* Burden Shift Analysis . . . . . . . . . . . . 16

            2.    Plaintiff Cannot Support a Claim of
                  Denial of Equal Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      D.    The Hostile Work Environment Claim
            Against the City Should be Dismissed . . . . . . . . . . . . . . . . . . . . . . . . . 22

            1.    Elements of a Hostile Work Environment Claim . . . . . . . . . . . . . 22

            2.    There is no Evidence to Support a
                  Hostile Work Environment Claim . . . . . . . . . . . . . . . . . . . . . . . 23

III.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## INDEX OF AUTHORITIES

<u>Statutes:</u>

42 U.S.C. §1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 U.S.C. §2000e . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

<u>Cases:</u>

*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . 12

*Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526 (10th Cir. 1994) . . . . . . . . . . . . . 18

*Davis v. United States Postal Serv.*, 142 F.3d 1334 (10th Cir. 1998) . . . . . . . . . . . . . 22-23

*Drake v. City of Fort Collins*, 927 F.2d 1156 (10th Cir. 1991) . . . . . . . . . . . . . . . . . . . 14

*EEOC v. PVNF, L.L.C.*, 487 F.3d 790 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 15

*EEOC v. WilTel, Inc.*, 81 F.3d 1508 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Figures v. Board of Pub. Utils.*, 967 F.2d 357 (10th Cir. 1992) . . . . . . . . . . . . . . . . . . 18

*Ford v. West*, 222 F.3d 767 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Igwe v. Saint Anthony's Hosp.*, 804 F.Supp. 2d 1183 (W.D. Okla. 2011) . . . . . . . . . . . 14

*Khalik v. United Air Lines*, 671 F.3d 1188 (10th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . 14

*L & M Enterprises v. BEI Sensors & Systems Co.*, 231 F.3d 1284 (10th Cir. 2000) . . . . 12

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) . . . . . . . . . . . . . . . . . . . . . . . 14

*Morris v. City of Colo. Springs*, 666 F.3d 654 (10th Cir. 2012) . . . . . . . . . . . . . . . . . . . 23

*Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . 21-22

*Powell v. Nunley*, 682 F. Supp.2d 1260 (W.D. Okla. 2010) . . . . . . . . . . . . . . . . . . . . . . . 13

*Rea v. Martin Marietta Corp.*, 29 F.3d 1450 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . 18

*Sandoval v. Boulder Regional Communications Ctr.*,
   388 F.3d 1312 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

DAVID FUQUA,                                  )
                                              )
    Plaintiff                             )
                                              )
-vs.-                                         )   Case No. CIV-17-115-HE
                                              )
THE CITY OF ALTUS, a political                )
subdivision of the State of Oklahoma et.al.   )
                                              )
    Defendants                            )

## MOTION FOR SUMMARY JUDGMENT OF
## DEFENDANT, THE CITY OF ALTUS,
## COMBINED WITH BRIEF IN SUPPORT OF MOTION

## MOTION FOR SUMMARY JUDGMENT

Defendant, the City of Altus, respectfully requests that judgment be entered in its favor, pursuant to Rule 56, Fed.R.Civ.P., on the three causes of action asserted against it in the First Amended Complaint for the reason that there is no controversy as to any material fact and Defendant is entitled to judgment in its favor as a matter of law.

## BRIEF IN SUPPORT OF MOTION

Plaintiff was employed by the City of Altus as its City Manager in May of 2015. Several months later, as concerns over his job performance arose, the City Council placed Plaintiff on a Plan of Improvement, setting goals to be achieved in order for him to continue his employment. At a special meeting held on January 14,  2016, the Council voted to terminate his employment. The vote was six to three in favor of termination.

1

Plaintiff brought suit against the City and three individuals claiming that his termination was due to discrimination based upon his religious beliefs. As to the City, Plaintiff's First Amended Complaint asserts three causes of action: a claim under Title VII of the Civil Rights Act of 1964 for religious discrimination; a claim under Title VII for hostile work environment, and a claim pursuant to 42 U.S.C. § 1983 for violations of his First Amendment right to freedom of religion and his Fourteenth Amendment right to equal protection.

## I. UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.1, the following are the undisputed material facts establishing that the City is entitled to judgment as a matter of law:

1. In September of 2013, the citizens of Altus voted to approve a City Charter which established a council-manager form of government. Under the Charter, the governing legislative body consists of nine (9) members i.e. the Mayor as ex officio council member-at-large and two (2) council members from each of four (4) wards (Excerpts Charter, Ex. "1").

2. Among its other powers and duties, the City Council has the power to appoint and remove the City Manager (Excerpt Charter, Article II, Section 7, Ex. "1").

3. Article III of the City Charter-City Manager provides, in part:

> There shall be a city manager. The council shall appoint him for an indefinite term by a vote of the majority of all its members. It shall choose him solely on the basis of his executive and administrative qualifications...The council may suspend or remove the city manager at any time by a vote of the majority of all of its members. (Excerpt Charter, Ex. "1").

2

4. Unlike most city charters, the City Charter adopted by the citizens of Altus also provides for other elected officers including an elected city clerk-treasurer (Excerpt Charter, Ex. "1"). Defendant Davis is the elected City Clerk-Treasurer. Plaintiff agrees that neither he nor the City Council has the power or control over her. He indicated that he had limited contact with her (Dep. Fuqua, pp. 101; 119; Ex. "2").

5. In the spring of 2015, the City advertized for a City Manager following the resignation of the first City Manager, Elizabeth Gray.

6. Following a screening process, on April 7, 2015, the City Council voted unanimously to extend a job offer to Plaintiff, David Fuqua (Minutes, Ex. "3").

7. On May 18, 2015, the City and Plaintiff executed an Employment Agreement (Ex. "4") which provided, in part:

Section 2. TERM

>A. Nothing in this Agreement shall prevent, limit or otherwise interfere with the right of the Employer to terminate the services of the City Manager at any time, subject only to the provisions of the City Charter, City Ordinances or Oklahoma State Statutes and as set forth in this Agreement herein.

Section 6. TERMINATION AND SEVERANCE PAY

>A. Employer reserves the right to terminate the City Manager at any time, for any reason or for no specific reason. Employer agrees that, in the event City Manager is terminated, severance pay shall be allowed City Manager pursuant to the policy set forth in this section, unless City Manager is terminated for cause, with just cause being defined as the conviction of a felony or an act of corruption...

3

8. In prior years, the City of Altus had experienced serious financial issues as well as a significant turn over and shortage of employees assigned to the Finance Department. The City retained the services of Crawford & Associates to conduct a financial analysis of the City as of the end of June 30, 2014. The Performeter Analysis prepared by Crawford & Associates was presented to the City Council in June of 2015 (Ex. "5") The report summarized the City's financial condition as follows:

> The strongest component of the ratings is the City's financial capability in the current year, followed closely by the City's financial performance. In addition, the City's financial position as of and for the year ended June 30, 2014 reflects a satisfactory rating. The 2014 overall reading of 7.4 indicates the evaluator's opinion that Altus' overall financial health and performance is above satisfactory.

9. At the time that Plaintiff was hired, Jan Neufeld was the Chief Financial Officer. She held that position since December of 2014.

10.    Shortly after Plaintiff was hired, the Assistant City Manager resigned his position. Plaintiff appointed Ms. Neufeld as the Acting Assistant City Manager (Ex. "6").

11.    In the summer of 2015, Plaintiff directed the Human Resources Director, Angie Murphy, to advertize for the position of Assistant City Manager. Twenty-one applications were received (Ex. "7"). A panel was not used to screen the applications as had been used in other instances. Only one candidate, Matthew Wojnowski, was interviewed and he was only interviewed by Plaintiff and Ms. Murphy (Dep. Fuqua, pp. 35-37; 46-47, Ex. "2". He was offered the position despite the fact that he had never served as either a City Manager

4

or an Assistant City Manager for a city of any size ( Dep. Fuqua, pp.35-37; Ex. "2").

12.   During the summer of 2015, the City advertized openings for the positions of City Engineer and Public Workers Director. A panel was used to screen applicants for both positions. At the suggestion of Plaintiff, the two positions were combined and offered to Johnny Barron.

13.   On August 18, 2015, Plaintiff, Matthew Wojnowski, City Council Member Dwayne Martin and Mayor Jack Smiley met for lunch. This was the first day of Mr. Wojnowski's employment as Assistant City Manager.

14.   During the lunch, information was provided by Plaintiff that revealed that he was a member of the Church of Jesus Christ of Latter Day Saints (referred to herein as the Mormon Faith). Mr. Wojnowski then self-disclosed that he was also of the Mormon Faith (Affidavit Martin, Ex. "8").

15.   On August 19, 2015, i.e. the first day after Mr. Wojnowski began his employment and Defendant Neufeld ceased being the Acting Assistant City Manager, Plaintiff issued her a oral reprimand (Ex. "9"). Less than two weeks later, Plaintiff issued her a written reprimand (Ex. "10").

16.   In between the two disciplinary actions issued to Defendant Neufeld, Plaintiff directed the City's I.T. person to order a key stroke monitor (Ex. "11") and to install the same on the computer used by Ms. Neufeld without her knowledge.

5

17.  The installation of the key stroke monitor came to the attention of Mayor Smiley who contacted the Oklahoma Municipal Assurance Group (OMAG), a self-assurance risk pool that provides liability coverage to the City. He spoke with the Associate General Counsel who provided an analysis of potential legal issues/concerns in connection with the installation of the key stroke monitor (Email from OMAG; Ex. "12").

18.  Plaintiff also contacted OMAG regarding the issue of the key stroke monitor and received two emails in response to his inquiries (Emails from OMAG; Exs. "13" and "14".

19.  Both in his communications with OMAG (Ex. "14") and in statements to the City Council, Plaintiff took the position that the City was in a "dire" financial condition. However, as recently as June of 2015, Crawford & Associates, a firm that specializes in municipal financial issues, had issued a report reflecting that the financial condition of the City was "above satisfactory." (Ex. "5").

20.  In the fall of 2015, Plaintiff requested that Crawford & Associates conduct an evaluation of the job performance of Defendant Neufeld. The report was issued on October 30, 2015 (Ex. "15"). While the report noted areas that needed improvement, it also indicated areas of high performance, including in budget management. It also stressed the need to consider the status of the accounting records when Defendant Neufeld was hired and the limitation on staffing when she began her employment.

21.  On November 3, 2015 and December 1, 2015, executive sessions were held to conduct a review of Plaintiff's performance during his first six months of employment as

authorized by 25 O.S. §307(B)(1) (Exs. "16" and "17"). During the meetings [1] members

expressed concerns that:

> A. Plaintiff did not appear to have a firm grasp on the financial condition of the City i.e. his view that it was "dire" and that the City may not be able to meet its obligations as they became due and owing versus the report of Crawford & Associates;

> B. The installation of the key stroke monitor and the possible legal exposure to the City and individuals;

> C. A growing concern regarding Plaintiff's treatment of Defendant Neufeld including his failure to conduct an evaluation of her performance and the failure to implement a Plan of Improvement; and

> D. Concerns regarding his management style and the possible negative impact on morale.

(Affidavit Smiley; Ex. "18;" Affidavit Shelton, Ex. "19;" Affidavit Henry, Ex. "20;" Affidavit Riffle, Ex. "21;' and Affidavit Kidwell, Ex. "22").

22. In an attempt to address the growing concerns, a Subcommittee of three city council members was established to create and monitor a Plan of Improvement for Plaintiff (Plan of Improvement, Ex. "23"). The three members of the Committee were: Chris Riffle; Jon Kidwell and Kevin McAuliffe. Plaintiff admits that he had no prior conflicts with the members of the Subcommittee and agrees that they were professional in their dealings with him regarding the Plan (Dep. Fuqua, pp. 154 and 164, Ex. "2").

---

[1]

The City Council voted to waive the executive session privilege as to the meetings in November of 2015, December of 2015, and January of 2016 only to the extent that such sessions addressed issues regarding the employment of Plaintiff.

23.   The Subcommittee met with Plaintiff to go over the Plan and to answer any questions he might have regarding the same. Plaintiff recalls meeting twice with the Subcommittee regarding the Plan (Dep. Fuqua, pp. 155; 157-158).

24.   While the Plan of Improvement was in place, members of the Subcommittee received new information that gave rise to additional concerns. Information had been provided that during a panel review of applications for the position of Electrical Superintendent in late December of 2015, Plaintiff had directed the Human Resources Director to contact Dan Scott, the former Electrical Superintendent who had been fired by Plaintiff, to give his assessment of an applicant. In addition, members were advised that Plaintiff had made the comment that perhaps he should just rehire Scott (Affidavit Riffle, Ex. "21;" Affidavit McAuliffe, Ex. "27).

25.   Subcommittee member Riffle contacted Plaintiff in an attempt to verify whether this information was accurate or a mere rumor. Plaintiff initially denied directing any contact with Scott. However, within thirty minutes, Plaintiff called back and changed his story (Affidavit Riffle, Ex. "21"). Member Riffle conveyed this new information to the other members.

26.   In January of 2016, the members of the Subcommittee met to discuss the view of each on any progress Plaintiff was making under the Plan. The unanimous conclusion of the three members was that Plaintiff was not showing any progress under the Plan; had not demonstrated a commitment to acknowledging the concerns of the City Council; and had not

exhibited a willingness to address the concerns in a constructive manner (Affidavit Riffle, Ex. "21;" Affidavit Kidwell, Ex. "22;" and Affidavit McAuliffe, Ex. "27").

27. Each of the three members prepared a Final Rating for presentation to the City Council (Exs. Kidwell "24"; McAuliffe "25" and Riffle "26").

28. In addition, Member McAuliffe prepared a power point presentation to brief the entire City Council on the work of the Subcommittee under the Plan (Ex. "28").

29. At a special meeting of the City Council held on January 14, 2016, Plaintiff's employment was terminated by a vote of six in favor and three opposed to the motion.

30. The City Council members voting in favor of termination and their reasons were:

A. <u>Mayor Jack Smiley</u>: Plaintiff did not appear to have a good grasp on the City's financial condition; did not understand the MAPS project and the allocation of dedicated sales tax; his attitude towards Defendant Neufeld and the installation of the key stroke monitor on her assigned computer without consulting the City Attorney; his misrepresentation of information provided by OMAG on the key stroke issue; his method in hiring two key positions; his contacts with Dan Scott in connection with the evaluation of applications for Electrical Superintendent; and his perceived preferential treatment of Angie Murphy, her husband and her children that had an adverse impact on morale. Plaintiff also demonstrated a problem in making decisions and attempted to involve the Mayor in areas outside of the scope of the duties of the Mayor (Affidavit Smiley, Ex. "18").

B. <u>Council Member Shelton</u>: Plaintiff did not have the right priorities in connection with the allocation of funds; did not handle personnel matters in an appropriate manner as shown by the key stroke monitor and his actions had impacted morale; and the report of the Plan of Improvement Subcommittee; (Affidavit Shelton, Ex. "19");

C. <u>Council Member Henry</u>: Plaintiff had failed to demonstrate good judgment and sound leadership in personnel matters related to Dan Scott and Defendant Neufeld; had demonstrated poor judgment in regards to the key stroke monitor;

had made questionable hiring decisions on the City Engineer and the Assistant City Manager; had not shown a firm understanding of the City's finances; and the report of the Plan of Improvement Subcommittee (Affidavit Henry, Ex. "20");

D.  Council Member Chris Riffle: See Ex. "26". In addition, Plaintiff had shown a lack of proper handling of personnel matters as shown by the key stroke monitor and the decline in morale; and a determination that Plaintiff had not been truthful in connection with Dan Scott matters resulting in damaging how his honesty and integrity were viewed (Affidavit Riffle, Ex. "21");

E.  Council Member Kidwell: See Ex. "24". In addition, Plaintiff's integrity had been damaged in connection with the installation of the key stroke monitor and his continued exercise of poor judgment in handling of personnel matters (Affidavit Kidwell, Ex. "22"); and

F.  Council Member McAuliffe: See Ex. "25"). In addition, Plaintiff had shown a lack of leadership particularly during a major ice storm where he did not appear to understand his role as Chief Executive Officer during a crisis; his handling of personnel matters was not appropriate as shown by the key stroke monitor issue and his dealings with the Human Resources Director and her family members that had an adverse impact on morale; and his actions gave rise to concerns regarding his ethics and integrity (Affidavit McAuliffe, Ex. "27").

30.  Two of the three Council Members who voted not to terminate Plaintiff at the special meeting held on January 14, 2016, had concerns regarding his performance but felt that he should be afforded more time to show improvement. Specifically, their concerns were:

A.  Council Member Jencks: Concerns regarding his handling of personnel matters and that he was overly critical of Defendant Neufeld and overly reliant on the Human Resources Director and the installation of the key stroke monitor without consulting legal counsel (Affidavit Jencks, Ex. "29"); and.

B.  Council Member Winters: Concerns pertaining to the method used to hire Matt Wojnowski and Johnny Barron; the installation of the key stroke monitor on the computer assigned to Defendant Neufeld; his very aggressive attitude towards Defendant Neufeld; his attitude and treatment toward Angie Murphy and members of her family that adversely impacted morale; and his very poor

10

handling of the ice storm that demonstrated a lack of how to handle a major crisis (Affidavit Winters, Ex. "30").

31.  Plaintiff admits that he received his full six month of severance pay as provided for in his Employment Agreement (Dep., Fuqua, Ex. "2").

32.  Mayor Smiley was interviewed at the end of the special City Council meeting on January 14, 2016. The newspaper article contained in the Altus Times published on January 15, 2016, did not indicate that the City Council had voted to terminate Plaintiff for "cause." (Ex. "31").

33.  Plaintiff filed a charge of discrimination with the EEOC on July 12, 2016, asserting claims of religious discrimination and retaliation (Ex. "32").

34.  A Dismissal and Notice of Right to Sue was issued by the EEOC on November 8, 2016 (Ex. "33").

35.  Subsequent to the termination of his employment, the position of City Manager continued to exist and is currently filled by a member of a protected class i.e. a female, Janice Cain.

## II.  ARGUMENT AND AUTHORITIES

### A.   Basis of Claims Against the City

In his First Amended Complaint, Plaintiff contends that after the individual Defendants learned that he, Wojnowski and Barron were all members of the Mormon Faith, they conspired and worked together in a common scheme (First Amended Complaint, ¶32) to cause his termination by:

11

1. Davis and Neufeld spreading lies about him to elected officials (First Amended Complaint, ¶ 33);

2. Davis made allegations regarding his hiring practices and that he was holding out positions for Mormon (First Amended Complaint, ¶ 33);

3. Davis and Neufeld talked about the "Mormon Thing" or the "Mormon Mafia" and spoke about his religion with members of the City Council (First Amended Complaint, ¶ 33-34);

4. Smiley made false allegations to the City Council that the installation of the key stroke monitor exposed the City to potential liability (First Amended Complaint, ¶ 35);

5. All three individual Defendants made statements to the City Council members to cause his termination beginning in the fall of 2015 through January of 2016 by meeting with City Council members to seek his termination (First Amended Complaint, ¶¶¶¶ 36; 41, 42 and 45).

However, the undisputed facts do not support these allegations and do not support his causes of action against the City of Altus.

## B.    Standard for Granting Summary Judgment

Federal Rule 56 provides that summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The standards applicable to a motion under Rule 56 are well established. "The purpose of a summary judgment motion, unlike that of a motion to dismiss, is to determine whether there is evidence to support a party's factual claims. Unsupported conclusory allegations thus do not create a genuine issue of fact." *L & M Enterprises v. BEI Sensors & Systems Co.*, 231 F.3d 1284, 1287 (10th Cir. 2000). See also *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (opposition to a Rule 56 motion "must be based

on more than mere speculation, conjecture, or surmise").

> This Court summarized the standard applicable to motions for summary judgment:

> Summary judgment "necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Where the nonmoving party bears the burden of proof at trial, as the plaintiff does in this case, he cannot rely on his pleadings to defeat summary judgment; instead, he must put forth evidence sufficient to create a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed. 2d 265 (1986).

*Powell v. Nunley*, 682 F. Supp.2d 1260 (W.D. Okla. 2010) (Heaton, J.).

## C.    The Religious Discrimination Claims Against the City Should be Dismissed

The First Amended Complaint asserts two causes of action against the City based upon Plaintiff's status as a member of the Mormon Faith. The First Cause of Action is a claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et.seq., asserting that the City's termination of his employment was discriminatory and was based upon his religion. The Fifth Cause of Action is a claim under 42 U.S.C. §1983, alleging that, in terminating his employment, Plaintiff was deprived of his First Amendment right to exercise his religious beliefs and his Fourteenth Amendment right to equal protection.

There is no factual support for either of these claims, and the City should be granted judgment dismissing both claims.

### 1.    Elements of a Claim under Title VII for Religious Discrimination or Under §1983 for Violation of Religious Freedom or Equal Protection

Plaintiff's First and Fifth Causes of Action are brought under Title VII (42 U.S.C.

§2000-e-2) and 42 U.S.C. §1983, respectively. However, the same legal standard applies to each claim. "[T]he elements of a plaintiff's case are the same, based on the disparate treatment elements outlined in McDonnell Douglas, whether that case is brought under §§ 1981 or 1983 or Title VII." *Drake v. City of Fort Collins*, 927 F.2d 1156, 1162 (10th Cir. 1991).

A plaintiff may prove a violation of §1983 or Title VII "either by direct evidence of discrimination or by following the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)." *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012). Under *McDonnell Douglas*, a three-step analysis is utilized. This Court has described the application of this analysis:

> To establish a prima facie case of termination on the basis of race or national origin, a plaintiff must show that: (1) she belongs to a protected class; (2) she was qualified for the job; (3) despite her qualifications, she was discharged; and (4) the job was not eliminated after her discharge. Baca v. Sklar, 398 F.3d 1210, 1216 (10th Cir. 2005). Once she makes a prima facie showing, the burden shifts to the employer to state a legitimate, nondiscriminatory reason for its adverse employment decision. If the employer meets this burden, then summary judgment is warranted unless the employee shows there is a genuine dispute of material fact as to whether the proffered reason was pretextual or not worthy of belief.

*Igwe v. Saint Anthony's Hosp.*, 804 F. Supp. 2d 1183, 1189-90 (W.D. Okla. 2011).

In the context of a claim of discrimination based upon plaintiff's religious beliefs, the United States Court of Appeals for the Tenth Circuit has held that the plaintiff must prove (1) he belongs to a protected class; (2) he suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of

14

discrimination. *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007).

Intentional discrimination may be proven either directly, "by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *EEOC v. WilTel, Inc.*, 81 F.3d 1508, 1513 (10th Cir. 1996).

### i.    There Is No Direct Evidence of Discrimination:

In *WilTel*, the Court of Appeals ruled that direct evidence would be an existing policy which was discriminatory on its face. In this case, Plaintiff's employment was pursuant to a City Charter that provided that any city manager, no matter his race, gender, ethnicity, age, color or religion could be terminated at any time by majority vote of the City Council subject only to the Charter, City Ordinances or State Statutes (Excerpt Charter, Ex. "1").

The City Council adopted a Personnel Policies and Procedures Manual in April of 2014 (Excerpts from Manual, Ex. "34"). Section 100: Introduction notes that the City Council has the lawmaking and policy making powers while the City Manager is the Chief Administrative Officer and is charged with enforcing City's laws and ordinances.

Section 220 of the Manual is entitled "Equal Opportunity. The introduction provides that:

> All employees and applicants shall be assured fair treatment in all aspects of personnel administration without regard to political affiliation, race, color, national origin, sex, age, disability, religion or creed and there shall be proper regard for their privacy and constitutional rights as citizens.

15

In this case, there is no showing of a policy that is discriminatory on it face.

Likewise, there is no evidence to indicate that any member of the City Council discussed Plaintiff's religion with him or expressed any negative thoughts/comments about the Mormon Faith. He admitted that he never asked Defendant Smiley or any other member of the City Council if they knew that he was of the Mormon Faith (Dep. Fuqua., p. 96). He also acknowledged that he has no knowledge that any of the individual Defendants made any comments about his religion to the other five City Council members who voted to terminate his employment (Dep. Fuqua, pp. 139).

Plaintiff never spoke to any of the six City Council members who voted to terminate his employment to ask the basis of their decision. He only assumes that it had to be based on his religion (Dep. Fuqua. pp. 136-137, Ex. "2"). However, the only two department heads he hired who are also of the Mormon Faith are still employed by the City.

There is no direct evidence of discrimination based on religion to support his First or Fifth Causes of Action.

### ii. *McDonnell Douglas* Burden Shift Analysis:

In this case, Plaintiff can arguably support a determination that he is a member of a protected class i.e. a member of the Church of Jesus Christ of Latter Day Saints. He satisfies two additional elements of a *prima facie* case i.e. he suffered an adverse employment action in that he was terminated from his position and that the position of City Manager under the City Charter continues to exist and is currently filled by a female. In addition, for the purpose

16

of this Motion, Defendant acknowledges that, when initially hired, Plaintiff appeared to have the minimum qualification for the position of City Manager.

Defendant does not concede that Plaintiff was terminated despite his apparent qualifications as his paper credential did not match his actual performance. In addition, the City can clearly meet its burden of articulating legitimate, non-discriminatory reasons for the decision of six City Council members to vote to terminate his employment on January 14, 2016 as outlined in paragraph 30 of the Statement of Undisputed Material Facts (See Affidavits of Smiley, Shelton, Henry, Riffle, Kidwell and McAuliffe (Exs. "18-22" and "27") as well as the evaluations of the three members of the Subcommittee (Exs. "24-"26").

These documents show a general consensus that Plaintiff's job performance was deficient in many areas including, but not limited to: personnel management; crisis management; lack of good judgment in dealing with personnel leading to a decline in morale; demonstrating favoritism; exposing the City to potential liability in connection with the installation of a key stroke monitor; targeting of Defendant Neufeld; and a lack of understanding and grasp of the City's finances.

Even two of the three City Council members who voted against termination had serious reservations regarding Plaintiff's performance and capabilities (Affidavits Jencks and Winter, Exs. "29" and "30"). They simply felt that Plaintiff should be afforded more time to demonstrate whether he could and would perform in an acceptable manner.

Plaintiff seeks to rely on purported discriminatory comments made concerning his

17

religion to support his claim that the proffered reasons for his termination were pretextual or not worthy of belief. In order to support this contention, he must prove that such comments were directly linked to the decision to terminate his employment.

The United States Court of Appeals for the Tenth Circuit  has consistently held that "plaintiff must demonstrate a nexus between the allegedly discriminatory statements and the defendant's decision to terminate her." *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1457 (10th Cir. 1994). *See also Figures v. Board of Pub. Utils.*, 967 F.2d 357, 360-61 (10th Cir. 1992) (evidence of racial comments is not probative of any issue in the case unless it is linked to relevant personnel actions); and *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994) ("Isolated comments, unrelated to the challenged action, are insufficient to show discriminatory animus in termination decisions").

In this case, Plaintiff cannot demonstrate any such nexus. Plaintiff contends that Defendants Davis and Neufeld made derogatory comments about the Mormon Faith such as the Mormon Thing or the Mormon Mafia. However, even if these comments were made, they had no influence on the decision to terminate his employment.

a. Jan Neufeld

All nine members of the City Council affirmatively state that they never heard Jan Neufeld make any comments about Plaintiff's religion or the religion of any employee. They further all agree that she never approached them to discuss Plaintiff's employment or to ask that they consider voting to terminate his employment (See Affidavits, Exs. "8;" "18"-22"

18

and "27").

Jan Neufeld testified that she never spoke to any of the City Council members about the Plaintiff or any belief she had that he was not treating her fairly. She noted that under the Charter she was not to speak with a council member about her employment or about Plaintiff's job performance (Dep. Neufeld, pp. 66; 69-70; 91; 107-108; Ex. "35"). As such, there is no evidence to support any showing that Neufeld participated in a conspiracy that led, directly or indirectly, to the decision to terminate Plaintiff's employment.

Plaintiff admits that he does not know of any City Council member to whom Neufeld made derogatory comments about his religion. He likewise has no knowledge of Neufeld meeting with or requesting any City Council member vote to terminate his employment (Dep. Fuqua, pp. 144-145; 170).

b. Debbie Davis

With reference to Defendant Davis, City Council members Martin, Jencks, Kidwell, Riffle, Shelton and McAuliffe had no discussions with her regarding Plaintiff, his religion or any request from her that they consider voting to terminate his employment (Affidavits, Exs. "8;" "19;" "21"-"22;" "27";"29").

Former City Council member Henry recalled one occasion where she may have made a passing reference to the "Mormon Thing." However, she never discussed Plaintiff's employment or suggested that he vote to terminate that employment (Affidavit Henry, Ex."20"). City Council member Winters, who voted *against termination,* recalled Davis

19

criticizing Fuqua for contacting banks and his treatment of Dan Scott. However, he never heard her make negative comments about Plaintiff's religion or requesting that he vote to terminate the Plaintiff (Affidavit, Ex. "30").

Defendant Davis testified that she did not speak with any of the City Council members regarding the Plaintiff whenever his employment was on the agendas for discussion. She also never went to any of the City Council members to ask that they consider firing the Plaintiff (Dep. Davis, pp. 164-165; 175; 180-184, Ex. "36"). As noted, this is consistent with the position of the City Council members.

Mayor Smiley does recall conversations in which Defendant Davis was critical of what she perceived as Plaintiff's treatment of her friend, Jan Neufeld, and his use of an Executive Committee. However, he does not recall negative comments about religion. While he acknowledged that it was clear that Davis did not like the Plaintiff, she never asked him to vote to terminate Plaintiff' employment (Affidavit, Ex. "18").

Plaintiff admitted that he has no knowledge that Defendant Davis made any religious comments to any City Council member other than possibly Mayor Smiley. He also acknowledged that he has no knowledge that she spoke with any City Council member and asked that they vote to terminate his employment (Dep. Fuqua, pp. 139; 142; 172-173).

    c.    <u>Jack Smiley</u>

With reference to the final alleged co-conspirator, Jack Smiley, all eight other City Council members, whether they voted for or against termination, affirmatively state that

Mayor Smiley never engaged in any discussion with them in which he attempted to convince or coerce them to vote to terminate Fuqua. Furthermore, they all agree that he never asked how they would vote on Plaintiff's employment and never made disparaging remarks about Plaintiff's religious affiliation, the Mormon Faith or any other religious faith (Affidavits, Exs. "8;" "19"-22;" "27;""29"-"30").

Under these undisputed facts, Plaintiff cannot establish a nexus between any alleged remarks by Defendants Davis, Neufeld or Smiley that would support a showing that the articulated reasons for the vote of six people to terminate Plaintiff's employment were a pretext for an underlying discriminatory motivation due to his religious affiliation.

### 2. Plaintiff Cannot Support a Claim of Denial of Equal Protection

In the Fifth Cause of Action, the First Amended Complaint asserts that the City's actions deprived Plaintiff of his right to equal protection under the Fourteenth Amendment. That allegation is not supported by any evidence that the City had a policy or custom which sanctioned the infringement of an employee's right to religious freedom. As the United States Court of Appeals for the Tenth Circuit has held:

> A plaintiff must demonstrate that a state employee's discriminatory actions are representative of an official policy or custom of the municipal institution, or are taken by an official with final policy making authority. See Randle v. City of Aurora, 69 F.3d 441, 446-50 (10th Cir. 1995). To subject a governmental entity to liability, "a municipal policy must be a 'policy statement, ordinance, regulation, or decision officially adopted and promulgated by [a muncipality's] officers.'" See Lankford v. City of Hobart, 73 F.3d 283, 286 (10th Cir. 1996) (quoting Starrett, 876 F.2d at 818); see also Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978). Absent such an official policy, a municipality may also be held liable if the

discriminatory practice is "so permanent and well settled as to constitute a 'custom or usage' with the force of law." Lankford, 73 F.3d at 286.

*Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1249 (10th Cir. 1999).

Under the foregoing standards, and in light of the undisputed facts set forth above, Plaintiff cannot establish either a claim of religious discrimination under Title VII, or a claim of violation of his First Amendment right to exercise his religion under §1983.

## B.    The Hostile Work Environment Claim Against the City Should be Dismissed

The United States Court of Appeals for the Tenth Circuit has observed that although Title VII does not expressly refer to hostile work environment, a victim of a hostile work environment may nevertheless be able to bring a cause of action under that Act. *Ford v. West*, 222 F.3d 767, 775 (10th Cir. 2000). The First Amended Complaint alleges that the workplace at the City of Altus was "permeated with discriminatory intimidation, ridicule and insult based on Plaintiff's religion." (Amended Complaint, ¶62).

### 1.    Elements of a Hostile Work Environment Claim

The threshold required in order for a claim of hostile work environment to be submitted to a jury is high. In order to avoid summary judgment:

> [A] plaintiff must show that a rational jury could find that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65, 67, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986)).

*Davis v. United States Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir. 1998).

In responding to a Rule 56 Motion, if a plaintiff can not produce evidence to meet this standard, summary judgment should be granted. *Sandoval v. Boulder Regional Communications Ctr.*, 388 F.3d 1312, 1326-27 (10th Cir. 2004).

The Tenth Circuit has summarized the law applicable to hostile work environment claims:

> Title VII does not establish "a general civility code." Citations omitted). Accordingly, the run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim. See, e.g., Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998) (discussing the Supreme Court's hostile work environment decisions, and stating that "[a] recurring point in these opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.

*Morris v. City of Colo. Springs*, 666 F.3d 654, 663-64 (10th Cir. 2012).

### 2. There is no Evidence to Support a Hostile Work Environment Claim

The facts developed during discovery in this case show that Plaintiff can adduce no support for his claim of hostile work environment.

Plaintiff admits that, while he was an employee of the City of Altus, he never heard anyone make any derogatory comments about his religious beliefs including, but not limited to:

1.  The Mormon Mafia- he only learned this from his attorney after he was not longer employed (Dep. Fuqua, p. 133-134)

2.  The Mormon Thing- he only learned this from Angie Murphy after he was no longer employed (Dep. Fuqua, p. 132; 134, Ex. "2")

3.    A Jonestown like cult at City Hall-he only learned this from Angie Murphy via text after his termination (Dep. Fuqua, p. 137, Ex. "2")

4.    A Mormon take over of the work place- he only learned this from Angie Murphy after he was no longer employed (Dep. Fuqua, p. 137, Ex. "2");

5.    He was delaying hiring an Electrical Superintendent and Fire Chief in order to find Mormons to fill the positions- he only learned this from Angie Murphy after he was no longer employed (Dep. Fuqua, p. 138, Ex. "2") and

6.    A poll being taken at City Hall to determine the religious beliefs of workers (Dep. Fuqua, p. 141, Ex. "2").

Plaintiff affirmatively testified:

Q.    Did you hear any term, either directed to you, specifically, or that you overheard, that you considered to be a reference to your religious beliefs?

A.    Not while I was employed (Dep. Fuqua, p. 134, lines 8-11, Ex."2").

Plaintiff also admitted that he never saw any cartoons, text messages, email or the like that ridiculed or made fun of his faith or the practices of his faith while he was an employee (Dep., Fuqua, pp. 189, Ex. "2").

There is no evidence that David Fuqua was subjected to a hostile work environment during his employment with the City. His sole source of alleged knowledge of any religiously offensive comments are second hand at best i.e. either from Angie Murphy after the fact or from his lawyer via a third party.

For the purpose of this Motion, there is *no evidence* that the legislative body of the City i.e. the City Council participated in any such conduct. With the except ion of a single stray comment that former Council member Henry might have heard, there is no evidence

24

to support a finding that there existed an environment while Plaintiff was at City Hall that was so permeated with ridicule, insults or discriminatory statements so as to alter his work environment and that created an abusive work environment. (See Affidavits, Exs. "8;" "18"-"22;" "27;" and "29"-"30").

## III. CONCLUSION

Plaintiff is clearly upset that his employment was terminated, which is understandable. However, the mere fact of termination does not support his claims of religious discrimination, denial of equal protection of the existence of a hostile work environment. Plaintiff could be terminated for any reason at any time pursuant to the City Charter and his Employment Agreement. He simply could not be terminated for an unlawful reason.

The majority of the governing body of the City of Altus, the only body that could hire and fire the City Manager have articulated legitimate, non-discriminatory reasons for their vote to terminate. Even two of the three members who voted not to terminate have set forth their concerns regarding his performance.

All eight city council members affirmatively state that none of the individual Defendants solicited, coerced or requested that they vote to terminate Plaintiff's employment. There is not a scintilla of evidence that their votes to terminate his employment were motivated, in whole or in part, by his religion. Likewise there is no credible evidence from which could be drawn any inference of religious animus resulting in the vote to terminate.

As outlined above, even assuming there was gossip at City Hall about the Mormon

religion, it did not give rise to a hostile work environment. Plaintiff admits that he never heard the comments while still employed. As such, it could not have altered his day to day work environment. Furthermore, since the overwhelming majority of the elected City Council members who had the power to hire or fire the City Manager never heard the alleged comments from Defendants Davis or Neufeld or any City employee they could not have been influenced by such purported comments in the decision to vote to terminate his employment.

For the reasons set forth above and in light of the exhibits, deposition testimony and Affidavits, Defendant, the City of Altus, respectfully requests that the Court enter judgment in its favor on all claims asserted against it in the First Amended Complaint.

Dated this 15th day of February, 2018

/s/ Margaret McMorrow-Love
Margaret McMorrow-Love, OBA #5538
John J. Love, OBA #5536
LOVE LAW FIRM
228 Robert S. Kerr Ave., Suite 540
Oklahoma City, Oklahoma 73102
(405) 235-3848
Fax: (405) 235-3863
Email: mml@lovelawfirm.legal
Email: jjl@lovelawfirm.legal
Attorneys for Defendant The City of Altus

## CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2018, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Barrett Bowers
Woodrow Glass
Ward & Glass
1601 36th Ave. N.W.
Suite 100
Norman, Oklahoma 73072
*Attorneys for Plaintiff*

Ambre Gooch
Collins, Zorn & Wagner P.C.
429 N.E. 50th Street, Second Floor
Oklahoma City, Oklahoma 73105
*Attorney for Defendant, Jan Neufeld*

Ronald T. Shinn, Jr.
Joshue Solberg
McAfee & Taft
211 N. Robinson Ave.
10th Floor
Oklahoma City, Oklahoma 73102-7176

Courtney Powell
Spencer Fain LLP
9400 N. Broadway Extension
Suite 600
Oklahoma City, Oklahoma 73114
*Attorney for Defendant, Debbie Davis*

*/s/ Margaret McMorrow-Love*
Margaret McMorrow-Love